**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 25-68-SDD-EWD |
| *versus* | : | |
| | : | |
| GODSON OGHENEBRUME | : | |

**UNITED STATES' MEMORANDUM IN OPPOSITION**
**TO THE DEFENDANT'S MOTION TO DISMISS**

**NOW INTO COURT** comes the United States of America, by Ellison C. Travis, Acting United States Attorney for the Middle District of Louisiana, through Jeremy S. Johnson, Assistant United States Attorney, who respectfully opposes the defendant's Motion to Dismiss the Indictment.

## I. INTRODUCTION

The defendant is charged with Possession of a Firearm by an Alien Admitted to the United States Under a Nonimmigrant Visa, in violation of 18 USC § 922(g)(5)(B), after firing a handgun in an act of domestic violence. The defendant has filed a motion to dismiss, arguing that 18 USC § 922(g)(5)(B) is not constitutional as applied to him under *Bruen.* However, that motion should be denied because (1) nonimmigrant aliens are not covered under the Second Amendment and (2) the United States has a historical tradition of disarming those without an allegiance to the United States, and 18 USC § 922(g)(5)(B) is analogous to firearm regulations at the founding of this country.

The Supreme Court cases, *Heller*, *McDonald*, *Bruen*, and *Rahimi,* demonstrate that the Second Amendment is a citizen's right. Based on *Heller*, and the Fifth Circuit's decisions in *Portillo-Munoz* and *Medina-Cantu*, whether an individual falls within "the people" whose rights

the Second Amendment protects depends on whether that individual is a member of the political community. The Supreme Court has acknowledged, in several cases, that the United States has the sovereign authority to define its own political community and to exclude aliens, in light of a lack of allegiance. For example, aliens actually can be deported or denied entry for speech that is protected by the First Amendment for citizens. However, nonimmigrant aliens, like the defendant, are subject to even further restrictions in that they are prohibited from making political contributions or expenditures. These limitations demonstrate that nonimmigrant aliens are not among "the people" fully protected under the First Amendment and are not part of the political community. Accordingly, nonimmigrant aliens should not be considered part of "the people" protected by the Second Amendment. Their temporary and transient status, being in the United States with no intention for permanent residence, and along with their employment restrictions, further supports the conclusion that they are merely guests without the allegiance and status to be members of the political community. Therefore, they are not protected by the Second Amendment.

Also, historical laws, in England, during the Revolutionary war, and the early founding of the United States, reveal a historical tradition in the United States of prohibiting aliens from possessing firearms due to their lack of allegiance to the sovereign. "Why" they were restricted was because of their lack of allegiance, and "how" they were restricted was by disarmament. Nonimmigrant aliens have not sworn allegiance to the United States, and clearly lack allegiance, given their temporary transient status and permanent residence in a foreign country. Therefore, 18 USC § 922(g)(5)(B) is analogous to laws restricting firearm possession at the founding of this country and is constitutional as applied to the defendant.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On February 7, 2025, the defendant was arrested by the East Baton Rouge Sheriff's Office after the defendant fired a handgun multiple times during a domestic dispute with the mother of his child, while his infant child was present. *See* Rec. Doc. 1. The victim had arrived with the baby while the defendant was in his apartment with another woman. *See* Rec. Doc. 1. Subsequently, the defendant told law enforcement that he fired the gun to scare her into leaving. *See* Rec. Doc. 1. Law enforcement would also observe multiple bullet strikes to the walls of the apartment. *See* Rec. Doc. 1.

The defendant was arrested, and subsequently it was determined that the defendant was a Nigerian foreign national present in United States pursuant to a nonimmigrant visa in the form of an F-1 Student Visa issued by the United States Department of State. *See* Rec. Doc. 1.

On May 20, 2025, a federal criminal complaint was filed against the defendant in the Middle District of Louisiana for Possession of a Firearm by an Alien Admitted to the United States Under a Nonimmigrant Visa, in violation of 18 USC § 922(g)(5)(B), and an arrest warrant was issued. *See* Rec. Doc. 1. The defendant was subsequently arrested on May 22, 2025. *See* Rec. Doc. 2. On May 29, 2025, the defendant was indicted by a federal grand jury in the Middle District of Louisiana with Possession of a Firearm by an Alien Admitted to the United Stats Under a Nonimmigrant Visa, in violation of 18 USC § 922(g)(5)(B). *See* Rec. Doc. 10. On July 28, 2025, the defendant filed a Motion to Dismiss the Indictment, and the defendant alleges that 18 USC § 922(g)(5)(B) is unconstitutional as applied to him.

## III. RELEVANT LAW

In the Constitution of the United States of America, the Second Amendment provides that, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized the right of citizens to keep and bear arms for self-defense, pursuant to the Second Amendment. *District of Columbia v. Heller,* 554 U.S. 570, 626 (2008).[1] However, the Court also stated, "like most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626.

*In New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* the Court set a two-part standard for determining the constitutionality of a law that regulates the possession of a firearm. 597 U.S. 1 (2022). First, a court is to determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. Second, if the individual's conduct is covered by the Second Amendment, then a court determines whether the government has demonstrated that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. "Why and how the regulation burdens the right are central to this inquiry… [I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Furthermore, a challenged law does not have to exactly match a "historical precursor" and be a "dead ringer" or "historical twin," as long as it is analogous enough to "comport with the principles underlying the Second Amendment." *Id.* at 692.

---

[1] *See also New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 8 (2022) ("In *District of Columbia v. Heller* and *McDonald v. Chicago* we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense").

Regarding the first part of the test, whether an individual's conduct is covered by the Second Amendment depends on whether an individual is included in "the people" whose rights the Second Amendment protects; if that individual is not included in "the people," then he or she has no Second Amendment right that can be violated. *United States v. Medina-Cantu*, 113 F.4th 537, 540 (5th Cir. 2024) ("If the Government was able to show that the regulated conduct falls outside of the Second Amendment's original scope, the court would conclude that the regulated activity is categorically unprotected."). In *Heller*, the Supreme Court defined "the people" as incorporating "all members of the political community." 554 U.S. at 580.[2] Then the Fifth Circuit in *Portillo-Munoz* and *Medina-Cantu*, relying on *Heller*, incorporated the definition of "the people" as "all members of the political community" in holding that the Second Amendment did not protect illegal aliens. *Medina-Cantu*, 113 F.4th at 540; *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011).

In *Cabell v. Chavez-Salido*, the Supreme Court observed that "citizenship" is a required part of "membership in the political community" and that "[a]liens are by definition . . . outside of this community." 454 U.S. 432, 438–40 (1982). Accordingly, after analyzing the phrase "right of the people," the Court in *Heller* determined that "the Second Amendment right is exercised individually and belongs to . . . *Americans*." *Heller*, 554 U.S. at 581 (emphasis added).

Previously, courts have denied motions to dismiss indictments charging violations of 18 USC § 922(g)(5)(B). In *United States v. Alkhaldi*, the Court decided that nonimmigrant visa holders were not included in the definition of "the people;" the Court defined "the people" as "a

[2] In *Heller*, the Supreme Court also quotes its decision in *United States v. Verdugo-Urquidez*, where it had previously defined the people as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). In his brief, the defendant utilized *Verdugo-Urquidez*'s language to define "the people," without the political community criteria. *See* Rec Doc. 33-1, pg 5.

class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Alkhaldi*, No-12-Cr-0001, 2012 WL 5415787, *3 (E.D. Ark. Sept. 17, 2012), *report and recommendation adopted*, 2012 WL 5415579 (E.D. Ark. Nov. 6, 2012)). In *United States v. Aleman-Lozano*, the Court denied a motion to dismiss where the defendant made a constitutional challenge based on *Bruen*. *United States v. Aleman-Lozano*, No. 21-CR-00323, 2024 WL 1661111 (M.D.Pa. Apr. 17, 2024). There, the Court stated that authorized immigrants "still remain outside of the political community," while not deciding if the Second Amendment covered the defendant, who was a nonimmigrant alien. *Id.* at *7. Instead, the Court decided 18 USC § 922(g)(5)(B) was constitutional because the statute was consistent with this Nation's historical tradition of firearm regulation; and, to that point, the Court stated, "the history provided by the Government is relevantly similar to the current statute, which disarms those who are in this country either unlawfully or on a nonimmigrant visa, because they are neither citizens nor have they taken an oath of allegiance to this country." *Id*. In reaching this decision, the Court, in *Aleman-Lozano,* stated that it was adopting the reasoning of *United States v. Jimenz-Shilon*, 34 F.4th 1042 (11th Cir. 2022) and *United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870 (M.D. Pa. Nov. 23, 2022). *Id.*[3]

In *DaSilva*, the Court, just like in *Jimenez-Shilon*, found there was a historical tradition of regulating the right to bear arms of those that "lack undivided allegiance to the United States" and were "outside of the membership of the political community;" the Court therefore held that it was constitutional to restrict an illegal alien from possessing a firearm. *DaSilva*, 2022 WL 17242870 at *10; s*ee Jimenez-Shilon*, 34 F.4th at 1049 ("the ability to keep and bear arms remained subject

[3] In his brief, the defendant alleges that *Aleman-Lozano* cited all pre-*Bruen* cases. See Rec. Doc. 33—1, pg. 3. However, *DaSilva* was post-*Bruen* and, in *DaSilva*, the Court found that the conclusion in *Jimenez-Shilon* conformed with *Bruen*. *DaSilva*, 2022 WL 17242870 at *10.

to governmental regulation. That is, Congress could lawfully restrict the privilege for those who—like illegal aliens today—did not owe or swear allegiance to the United States").

Recently, the Seventh Circuit in *United States v. Carbajal-Flores*, upheld the constitutionality of 18 U.S.C § 922(g)(5)(A), possession of a firearm while illegally or unlawfully in the United States, on the basis that "our Nation's regulatory tradition supports disarming aliens who have not sworn an oath of allegiance to the sovereign." 143 F.4th 877, 889 (7th Cir. 2025). The Court defined those who have not sworn an oath of allegiance to the sovereign as "people who have not naturalized and taken the oath of renunciation and allegiance." *Id.* (citing 18 U.S.C § 1448). As an F-1 Student Visa holder, the defendant is a nonimmigrant, defined as "an alien having a **residence in a foreign country** which he has **no intention of abandoning**, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study…" 8 U.S.C § 1101(a)(15)(F)(i) (emphasis added). In other words, the defendant has not sworn allegiance to the United States of America.

## IV. ARGUMENT

### A. The Defendant is Not Protected by the Second Amendment

Recent Supreme Court Decisions Demonstrate That the Second Amendment is a Citizen's Right

As a noncitizen, based upon recent Supreme Court decisions, the defendant does not have a Second Amendment right to bear arms. First, the opinion in *Heller* demonstrates that this is the Supreme Court's understanding. *Heller,* 554 U.S. at 595 ("right of citizens"); *id.* at 603 ("an individual citizen's right"); *id.* at 608 (right "enjoyed by the citizen"); *id.* at 625 ("weapons not typically possessed by . . . citizens"); *id.* ("possession of firearms by . . .

citizens"); *id.* at 635 ("citizens"). Next, in *McDonald v. City of Chicago, Ill.*, the Supreme Court repeatedly used the word citizen in this context. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 768 (2010) ("citizens must be permitted to use handguns for the core lawful purpose of self-defense"); *id.* at 770 ("right of the citizens to keep and bear arms"); *id*. at 773 ("right of all citizens to keep and bear arms"); *id*. at 774 ("right of all citizens to keep and bear arms"); *id*. at 776 ("blacks, as citizens, have equal right to protection, and to keep and bear arms for self-defense").

Then, in *Bruen*, the Supreme Court repeatedly interpreted the phrase "the people" as limited to protecting the rights of "Americans" or "citizens." *See Bruen*, 597 U.S. at 70 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (citing *Heller*, 554 U.S. at 581); *see also id.* at 8–9 (explaining that, in *Heller*, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary … citizen to possess a handgun in the home for self-defense"); *id.* at 26 ("The Second Amendment . . . surely elevates above all other interests the right of . . . citizens to use arms"); *id*. at 31–32 ("It is undisputed that petitioners . . . —two ordinary, . . . adult citizens—are part of 'the people' whom the Second Amendment protects."); *id.* at 38 ("citizens"); *id*. at 71 (characterizing the right to bear arms as belonging to "citizens"); *id.* at 78 (Alito, J., concurring) ("*Heller* correctly recognized that the Second Amendment codifies the right of ordinary … Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun."). In *Rahimi*, the Supreme Court again referred to the right to bear arms as a right of "citizens." *United States v. Rahimi*, 602 U.S. 680, 691 (2024) ("In *Heller*, this Court held that the right applied to ordinary citizens within the home."); *see also id.* at 700 ("[O]ur Nation's tradition of firearm regulation

distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not"); *id.* at 709 (referring to "an arms-bearing citizenry") (Gorsuch, J., concurring).

Nonimmigrant Aliens Are Not a Part of the Political Community

The Second Amendment protects "all members of the political community." *Heller*, 554 U.S. at 580; *Medina-Cantu*, 113 F.4th at 540; *Portillo-Munoz*, 643 F.3d at 440. Previously, as mentioned, aliens by definition are outside of the political community. *Cabell*, 454 U.S. at 438–40 (1982); *see also Foley v. Connelie,* 435 U.S. 291, 295- 296 (1978) ("a State's historical power to exclude aliens from participation in its democratic political institutions [is] part of the sovereigns' obligation to preserve the basic conception of a political community") (citations and question marks omitted). The Supreme Court has further stated, in regard to aliens, that "by withholding his allegiance from the United States, he leaves outstanding a foreign call on his loyalties which international law not only permits our government to recognize but commands it to respect." *Harisiades v. Shaughnessy*, 342 U.S. 580, 585-586 (1952). So, the Supreme Court has acknowledged this nation's right to define its own political community and to exclude aliens, in light of a lack of allegiance.

Particularly salient, aliens may be deported or denied entry based upon speech that is protected by the First Amendment for U.S. citizens. *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 291 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012) (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952) (First Amendment does not protect aliens from deportation because of membership in the Communist Party)); *see also* 8 U.S.C § 1182(a)(3)(D); *Kleindienst v. Mandel*, 408 U.S. 753 (1972) (upholding denial of nonimmigrant visa for Marxist theorist). This means aliens are not among "the people" fully protected by the

First Amendment; therefore, they are not a part of the political community and are not among "the people" protected by the Second Amendment.

Nevertheless, even if the Court were to consider noncitizens part of the political community or not resolve that issue, the defendant's status as a *nonimmigrant* alien precludes him from Second Amendment protections. As a nonimmigrant alien, the defendant's stay in the United States is temporary, and without an intention to immigrate to the United States. 8 U.S.C §1101(a); *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 291 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). In addition to their legally transient status, nonimmigrant aliens face considerable work restrictions. *See* 8 C.F.R. § 274a.12; C.F.R. § 274a.12(b)(6) (for F-1 Visa holders).

The temporary status of nonimmigrant aliens signifies a lack of allegiance to the United States. Accordingly, nonimmigrant aliens are also included in the foreign nationals that are prohibited from making political contributions. *See* 52 U.S.C § 3012; *Bluman,* 800 F. Supp. 2d at 286-87 (the upholding a law that prohibits foreign nationals from making political contributions in federal elections). For example, pursuant to 52 U.S.C § 3012, nonimmigrant aliens cannot make contributions in connection with a Federal, State or local election; cannot contribute to a committee of a political party; cannot make an expenditure for an electioneering communication; or make a person solicit or accept any such contribution. Significantly, because the ability to make political contributions and expenditures is a fundamental First Amendment right for U.S. Citizens, the exclusion of nonimmigrant aliens from such activities, just further indicates that nonimmigrant aliens are not a part of the political community.[4]

[4] These laws were enacted to prevent foreign influence on U.S. elections. *Bluman,* 800 F. Supp. 2d at 283-284.

Additionally, the Courts in *Alkhaldi* and *Bluman* have drawn distinctions between resident aliens and aliens temporarily in the U.S., like the defendant, who is a nonimmigrant alien.[5] In *Alkhaldi*, the Court, in deciding that the defendant in that case was not protected by the Second Amendment, noted that that defendant, who was in the U.S. pursuant to a nonimmigrant student visa, "was allowed to enter this country temporarily and for one purpose only: to pursue educational opportunities." *Alkhaldi*, 2012 WL 5415787 at*4. In *Bluman*, in upholding the prohibition against political campaign contributions, the Court noted that aliens in the U.S. "temporarily by definition have primary loyalty to other national political communities, many of which have interests that compete with those of the United States," while, in contrast, lawful permanent residents may serve in the United States military and have their indefinite residence in the United States. *Bluman*, 800 F. Supp. 2d at 290-291. The defendant is neither a citizen nor a lawful permanent resident, but merely a guest in the country and as such is not a member of the political community.

### B. <u>18 USC § 922(g)(5)(B) is Consistent with the United States' Historical Tradition of Firearms Regulation and is Analogous to Laws at the Founding of the United States</u>

If this Court were to find that the Second Amendment applies to a nonimmigrant alien, like the defendant, then the analysis proceeds to the second part of the *Bruen* analysis. Under the second part of the *Bruen* test, the government is required to show that a firearm regulation is consistent "with this Nation's historical tradition of firearm regulation." *Bruen,* 597 U.S. at 17. This inquiry centers on "why and how" a law burdens the Second Amendment right, and if that law imposes

[5] It is also worth noting that in *Verdugo-Urquidez,* when the Court had referred to aliens with substantial connections to this country, it primarily referred to cases that involved resident aliens. 494 U.S. at 271 (1990). Also, *Verdugo-Urquidez* dealt with Fourth Amendment rights, and the 5th Circuit in *Portillo-Munoz* opined that "the people" in both the Second and Fourth Amendment may not cover the same groups of people, because the Second Amendment was an "affirmative right" and "the Fourth Amendment is at its core a protective right against abuses by the government." *Portillo-Munoz,* 643 F.3d at 440-441.

"similar restrictions for similar reasons" as laws at the founding of this country, then the law will be deemed permissible; the law need not be a "historical twin" as long as it is analogous enough. *Id.* at 692.

History demonstrates that the United States has a historical tradition of disarming those who do not have an allegiance to the United States. *Carbajal-Flores,* 143 F.4th at 886-888; *Aleman-Lozano*, 2024 WL 1661111 at*7; *Jimenez-Shilon*, 34 F.4th at 1048-1049. As such, 18 USC § 922(g)(5)(B), which disarms nonimmigrant aliens, who do not have an allegiance to the United States, is constitutional. Also, the defendant's as-applied challenge fails, since he is a nonimmigrant alien pursuant to an F-1 Visa, who has no allegiance to the United States.

Under the English Bill of Rights, the right to keep and bear arms was not "available to the whole population" but was instead expressly limited to "'Subjects.'" *Heller*, 554 U.S. at 593 (quoting English Bill of Rights 1689, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441); *see id.* ("By the time of the founding, the right to have arms had become fundamental for English *subjects*.")(emphasis added). Furthermore "an alien's rights could be conditioned on his 'allegiance to the laws and government.'" *Carbajal-Flores,* 143 F.4th at 883 (citing Partick J. Charles, *Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU J. Pub. L. 35, 78 (2011)).

"[T]he right to own guns in eighteenth-century England was statutorily restricted to the landed gentry," and under "English common law[,] . . . 'aliens [were] incapacitated to hold lands.'" *Jimenez-Shilon*, 34 F.4th at 1046 (quoting *Bayard v. Singleton*, 1 N.C. 5, 9 (1787)). "This prohibition on land ownership was…rooted in the doctrine of allegiance." *Carbajal-Flores,* 143 F.4th at 883. "As Blackstone explained, '[i]f an alien could acquire a permanent property in lands,' he would 'owe an allegiance, equally permanent with that property, to the king of England.' But

such an allegiance 'would probably be inconsistent with that [] which he owe[d] to his own' sovereign." *Id.* at 833 (quoting 1 William Blackstone Commentaries on the Laws of England 360). However, an alien could obtain the right to own land and bear arms through naturalization. *Carbajal-Flores,* 143 F.4th at 884 (citing Blackstone, *supra*, at 362) (citing Patrick J. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 Tex. Rev. L. & POL. 61, 73 (2010))).

"The English view carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)). For instance, most colonies prohibited the sale of arms to Native Americans, who were traditionally not regarded as citizens because of their membership in sovereign tribes. *See Elk v. Wilkins*, 112 U.S. 94 (1884). Also, "colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms." *Jimenez-Shilon*, 34 F.4th at 1048 (quoting Adams Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 116 (2011)). "Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns." *Id.* at 1048 (quoting *Winkler,* supra) (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157–60 (2007) (compiling statutes)). "In both cases, an individual's 'undivided allegiance to the sovereign' —his 'membership in the political community'—was regarded as 'a precondition to the right to keep and bear arms.'" *Id.* at 1048 (quoting *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (quoting Churchill, *supra*, at 157).

Notably, while "[a]lien men" in colonial America "could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they did not have "the right to bear arms" because these "were rights of members of the polity." *See United States v. Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998)).

The Eleventh Circuit, in *Jimenez-Silon*, reasoned that the laws of the "emerging republic" revealed "the selective 'disarmament of groups associated with foreign elements.'" *Jimenez-Shilon*, 34 F.4th at 1048 (quoting Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1548–49 (2010)). The Court noted that, "by refusing to take an oath of allegiance to the state, those associated with foreign governments renounced their membership in the American political community and, in doing so, forfeited the state's protection of their right to arms—even if they continued to live on American soil." *Jimenez-Shilon*, 34 F.4th at 1048 (citing *Perez*, 6 F.4th at 462 (Menashi, J., concurring)).

As well, during the American Revolution, colonial governments disarmed those who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn. 128–29 (compiling statutes); *see also* Churchill, *supra*, 25 L. & Hist. Rev. at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."); *Carbajal-Flores,* 143 F.4th 877, 886 (mentioning Pennsylvania, North Carolina, and New Jersey). The Bill of Rights codified the principle that membership in the political community is a prerequisite for the right to bear arms. *See McDonald*, 561 U.S. at 769–

70 ("The right of *the citizens* to keep and bear arms has been justly considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, p. 746 (1833)) (emphasis added)). Indeed, "Framing-era sources 'refer to arms-bearing as a *citizen's* right' that was closely associated with national fealty and membership in the body politic." *Jimenez-Shilon*, 34 F.4th at 1048 (collecting sources and quoting Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013)); The Federalist No. 46, at 296 (James Madison) (Clinton Rossiter ed., 1961); The Federalist No. 28, at 176 (Alexander Hamilton).

Accordingly, "many early state constitutions . . . expressly limited the right to keep and bear arms to 'citizens.'" *Id.* at 1049 (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (discussing the same constitutions); *see also Rahimi*, 144 S. Ct. at 1913 (Kavanaugh, J., concurring) ("Our interpretation [of the Second Amendment] is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment") (quoting *Heller*, 554 U.S. at 600–01); Tenn. Const. of 1870, art. I, § 26. Tragically, the "practice of disarming slaves and Native Americans survived the Revolutionary War, confirming the Founders adhered to the tradition of barring groups deemed outside the polity from keeping arms." *Carbajal-Flores,* 143 F.4th at 886 (citing *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting)). Similarly, "aliens of all backgrounds, despite being free to 'exercise sundry other civil rights' at the time, could not exercise 'the right to bear arms.'" *Id.* (quoting Amar, at 48).

Additionally, the Second Amendment expressly references "a well-organized militia." U.S. Const. amend. II. "[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 628 (emphasis added). *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-Shilon*, 34 F.4th at 1047–48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). There was no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen*, 597 U.S. at 30 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

The Seventh Circuit concluded, in *Carbajal-Flores,* "from the colonies to—most critically—the early Republic, governments consistently conditioned the ability to possess firearms on one's loyalty to the sovereign" and "people outside the polity were regularly disarmed unless and until they swore an oath of allegiance." *Carbajal-Flores,* 143 F.4th at 886. Furthermore, the Court in *Carbajal-Flores* reasoned that "this provides strong historical evidence that the Founders would have considered such regulations compatible with the Second Amendment. *Id. at* 886.

Given that there is a historical tradition of disarming those without an allegiance to the sovereign, the analysis turns to "why and how." Allegiance demonstrates an acceptance of the societal order, and aliens, particularly nonimmigrant aliens, have not demonstrated such allegiance. *Carbajal-Flores,* 143 F.4th 877; *See Kanter v. Barr*, 919 F.3d 437, 457- 458 (7th Cir. 2019). How this has been accomplished historically has been by disarming aliens, and 18 USC §

922(g)(5)(B) furthers this end, by disarming nonimmigrant aliens, like the defendant, who are present in the United States with no intention to reside here permanently.

## V. CONCLUSION

For all the reasons set forth in this memorandum, the United States respectfully submits that the motion to dismiss the indictment should be denied.

UNITED STATES OF AMERICA, by

ELLISON C. TRAVIS
ACTING UNITED STATES ATTORNEY

/s/ Jeremy S. Johnson
Jeremy S. Johnson, TXBN 24094755
Assistant United States Attorney
451 Florida Street, Suite 300
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: jeremy.johnson@usdoj.gov