**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                                   CRIMINAL ACTION

VERSUS

                                                                              25-68-SDD-EWD

GODSON OGHENEBRUME

**RULING**

Before the Court is the Motion to Dismiss Indictment[1] filed by Defendant Godson Oghenebrume ("Defendant"). The Government has filed an Opposition.[2] Defendant filed a Reply.[3] For the reasons that follow, the Motion will be denied.

**I.      BACKGROUND**

The Defendant in this case has been indicted for possession of a firearm by an alien admitted to the United States under a nonimmigrant visa,[4] in violation of 18 U.S.C. § 922(g)(5)(B).[5] Defendant filed the instant Motion seeking dismissal of the Indictment on the grounds that § 922(g)(5)(B) is unconstitutional under the Second Amendment both facially and as applied to him.[6]

**II.     MOTION TO DISMISS**

Federal Rule of Criminal Procedure 12(b)(1) provides that "a party may raise by pretrial motion any defense, objection, or request that the court can determine without a

---

[1] Rec. Doc. 33.
[2] Rec. Doc. 44.
[3] Rec. Doc. 57.
[4] Specifically, Defendant held an "F-1" student visa, which applies to "an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study…" 8 U.S.C. § 1101(a)(15)(F)(i).
[5] Rec. Docs. 1, 10. The statute provides four exceptions to the application of § 922(g)(5)(B), none of which Defendant argues to apply in this case. *See* 18 U.S.C. § 922(y)(2).
[6] *See* Rec. Doc. 33-1.

trial on the merits."[7] Specifically, "a party may move to dismiss an indictment based on a defect in the indictment, including failure to state an offense."[8] Courts may resolve any defects before trial when the motion presents a question of law.[9]

### III.    LAW AND ANALYSIS

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[10]

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the United States Supreme Court advanced a two-step framework for Second Amendment constitutional challenges.[11]  The Court held:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[12]

Regarding the second step, "[t]his historical inquiry that courts must conduct will often involve reasoning by analogy[.]"[13] And "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[14] This involves finding "a well-established and representative historical analogue, not a historical twin. So even if a modern-day

---

[7] Fed. R. Crim. P. (12)(b)(1).
[8] *United States v. Wilson*, No. CR 22-238, 2024 WL 4436637, at *2 (E.D. La. Oct. 6, 2024) (citing Fed. R. Crim. P. 12(b)(3)(B)(v)) (cleaned up).
[9] *See United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011).
[10] U.S. Const. amend. II.
[11] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).
[12] *Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).
[13] *Id*. at 28.
[14] *Id*. at 28–29 (citing C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[15]

In *United States v. Rahimi*, the Supreme Court further clarified the "historical analogue" requirement.[16] The Court explained that its recent Second Amendment cases "were not meant to suggest a law trapped in amber."[17] "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."[18] The Court instructed that "[w]hy and how the regulation burdens the right are central to this inquiry."[19]

The first issue raised by the parties is whether Defendant is considered one of "the people" to whom the Second Amendment applies. Defendant was admitted to the United States lawfully under a nonimmigrant "F-1" student visa. F-1 student visas are recognized under 8 U.S.C. § 1101(a)(15)(F)(i), which applies to "an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study…"[20] The statute identifies such people as "nonimmigrant aliens."[21] In short, Defendant argues he is one of "the people" protected by the Second Amendment because, although a noncitizen, he is authorized to reside in the United States.[22] The Government argues that Defendant is

---

[15] *Id*. at 30.
[16] *United States v. Rahimi*, 602 U.S. 680, 691 (2024).
[17] *Id.*
[18] *Id*. at 692.
[19] *Id.*
[20] 8 U.S.C. § 1101(a)(15)(F)(i).
[21] 8 U.S.C. § 1101(a)(15)(F).
[22] Rec. Doc. 33-1, pp. 4–7.

not part of "the people" because as a nonimmigrant alien, he is not part of the political community and has not sworn allegiance to the United States.[23]

In *District of Columbia v. Heller*, which held that the Second Amendment guarantees an individual right to possess firearms, the Supreme Court stated that "the people" "refers to all members of the political community[.]"[24] In other words, the term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[25] The Court expressed that the Second Amendment right "belongs to all Americans."[26] However, the Court noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."[27]

In *United States v. Portillo-Munoz*, the Fifth Circuit held that aliens unlawfully present in the United States are not "the people" under the Second Amendment, reasoning that "[i]llegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community,' and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood."[28] *Portillo-Munoz* was a pre-*Bruen* decision. However, in *United States v. Medina-Cantu*, a post-*Bruen* case, the Fifth Circuit reached the same conclusion, specifically finding that *Bruen* did not abrogate *Portillo-Munoz.*[29] In so finding, the *Medina-Cantu* court noted that *Bruen* and *Rahimi* "provide[] little clarification as to *who* is protected by the Second Amendment."[30]

---

[23] Rec. Doc. 44, pp. 5–7.
[24] *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008).
[25] *Id.* (quoting *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265 (1990)).
[26] *Id.* at 581.
[27] *Id.* at 626.
[28] *United States v. Portillo-Munoz*, 643 F.3d 437, 440, 442 (5th Cir. 2011), *as revised* (June 29, 2011).
[29] *United States v. Medina-Cantu*, 113 F.4th 537, 539–542 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1318, (2025).
[30] *Id.* at 541 (italics in original).

Defendant argues that, "[a]s opposed to *unlawful* immigrants, there are strong reasons to believe that lawful[] immigrants fall under the protection of the Second Amendment."[31] Defendant contends he is part of the national community because he entered the country legally, thereby developing "sufficient connection to the United States."[32]

In response, the Government cites *United States v. Alkhaldi*, where the district court for the Eastern District of Arkansas found that lawful temporary resident aliens are not "the people" under the Second Amendment, reasoning as follows:

> In this instance, the Court finds that [the defendant] is not in the class of persons who are part of the national community or who have otherwise developed sufficient connection with this country to be considered part of that community for purposes of the Second Amendment. He did not come to the United States with the intention of gaining citizenship and, thus, is not firmly on the path toward that goal. There is nothing to suggest he intends to abandon his foreign resident [sic]. Instead, he was allowed to enter this country temporarily and for one purpose only: to pursue educational opportunities.[33]

The Supreme Court has commented on the rights of noncitizens in this country. In *Johnson v. Eisentrager*, the Court stated:

> The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.[34]

---

[31] Rec. Doc. 33-1, p. 6.
[32] *Id.* at p. 7.
[33] *United States v. Alkhaldi*, No. 4:12CR00001-01 JLH, 2012 WL 5415787, at *4 (E.D. Ark. Sept. 17, 2012), *report and recommendation adopted*, No. 4:12CR00001-01 JLH, 2012 WL 5415579 (E.D. Ark. Nov. 6, 2012).
[34] *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).

Elaborating on this topic, the Tenth Circuit in *United States v. Huitron-Guizar* described

the "ascending scale of constitutional rights" of noncitizens, noting:

> An unlawfully present alien has fewer rights than one lawfully
> here; an illegal alien generally has no right to assert a
> selective-enforcement claim to thwart deportation. A lawful
> alien here fewer than five years can be denied enrollment in
> Medicare, unlike one here for, say, a decade. A *temporary*
> resident alien has fewer rights than a *permanent* resident
> alien; the former, for example, may be barred from making
> campaign contributions. Likewise, a lawful permanent
> resident has fewer rights than a citizen, since a state can form
> a citizens-only police force.[35]

In considering whether an illegal alien was part of "the people," the Tenth Circuit went on

to note that in *Heller*, the Supreme Court repeatedly connected arms-bearing to

citizenship.[36] The Government also argues this point to urge that Defendant, a noncitizen,

is not "the people."[37] For example, the *Heller* Court stated: "we do not read the Second

Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just

as we do not read the First Amendment to protect the right of citizens to speak for *any*

*purpose*," and "whatever else [the Second Amendment] leaves to future evaluation, it

surely elevates above all other interests the right of law-abiding, responsible citizens to

use arms in defense of hearth and home."[38] The same can be said for *Bruen*, where the

Court frequently referred to Second Amendment rights as belonging to "citizens."[39]

Despite the Supreme Court's language to this effect, the Tenth Circuit "hesitate[d] to infer

---

[35] *United States v. Huitron-Guizar*, 678 F.3d 1164, 1166–67 (10th Cir. 2012) (citing *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 488 (1999); *Mathews v. Diaz,* 426 U.S. 67, 87 (1976); *Bluman v. Fed. Election Comm'n,* 800 F.Supp.2d 281, 288 (D.D.C. 2011), *aff'd* 565 U.S. 1104 (2012); *Foley v. Connelie,* 435 U.S. 291, 300 (1978)).
[36] *Id.* at 1168.
[37] Rec. Doc. 44, pp. 7–9.
[38] *Huitron-Guizar*, 678 F.3d at 1168 (quoting *Heller*, 554 U.S. at 595, 635). The *Heller* Court also said the right "belongs to all Americans." *Heller*, 554 U.S. at 581.
[39] *See Bruen*, 597 U.S. at 26, 31–32, 70–71.

from *Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens."[40]
The court noted that in *Heller*, the Supreme Court cautioned: "since this case represents
[our] first in-depth examination of the Second Amendment, one should not expect it to
clarify the entire field."[41] And in *Bruen*, Justice Alito made clear in his concurring opinion
that the Court's "holding decides nothing about who may lawfully possess a firearm."[42]
Ultimately, the Tenth Circuit declined to answer the seemingly "large and complicated"
question of the extent of "the people" because it found § 922(g)(5)(A) passed
constitutional muster for other reasons.[43]

As noted, the Fifth Circuit has expressly held that illegal aliens are not covered by
the Second Amendment.[44] But this Court has located no cases within this Circuit
addressing whether lawful aliens are part of "the people."  And, as several courts have
noted, the term lacks a simple definition under current jurisprudence.[45] In this case, the
Court will assume without deciding that Defendant is encompassed within "the people"
because, even if Defendant is presumptively covered by the Second Amendment, the
Court finds that Defendant's challenge fails at the second step of the *Bruen* analysis.

Multiple courts have determined there is a strong history of disarming people who
have not sworn allegiance to the United States. Although most of those decisions involved
illegal aliens, the Court finds the reasoning behind those decisions supports the same
result here. In rejecting a Second Amendment challenge to § 922(g)(5)(A), the Seventh

---

[40] *Huitron-Guizar*, 678 F.3d at 1168.
[41] *Id.* at 1169 (quoting *Heller*, 554 U.S. at 635).
[42] *Bruen*, 597 U.S. at 72 (Alito, J., concurring).
[43] *Huitron-Guizar*, 678 F.3d at 1169.
[44] *Portillo-Munoz*, 643 F.3d 437; *Medina-Cantu*, 113 F.4th 537.
[45] *See United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870, at *5 (M.D. Pa. Nov. 23, 2022);
*Huitron-Guizar*, 678 F.3d at 1166–69; *United States v. Carbajal-Flores*, 143 F.4th 877, 882 (7th Cir. 2025);
*United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044–46 (11th Cir. 2022).

Circuit recently provided a thorough discussion of the history and tradition supporting the disarming of illegal aliens in *United States v. Carbajal-Flores*.[46] The court began with an examination of the English common law.[47] William Blackstone distinguished between "natural-born subjects," who were "born within the dominions of the crown of England," and "aliens," who were not.[48] Natural-born subjects had an allegiance to the sovereign by birth, and this status guaranteed "a great variety of rights," more extensive than those afforded to aliens.[49] Further, "an alien's rights could be conditioned on his 'allegiance to the laws and government.'"[50] At English common law, aliens could not hold land due to concerns over a lack of allegiance to the sovereign.[51] Notably, land ownership was linked to gun ownership, as "the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry."[52] The Seventh Circuit noted that "[t]his provides early evidence … that concerns over an alien's lack of allegiance to the Crown, which justified barring him from holding land, also warranted barring him from keeping arms."[53] Naturalization, which required "oaths of allegiance and supremacy in the presence of the parliament," provided a path for aliens to secure rights of a natural-born subject, including land and gun ownership.[54]

---

[46] 143 F.4th at 882–889.

[47] The court noted the relevance of the English common law due to the fact that the Second Amendment "codified a pre-existing right." *Id.* at 882–83 (quoting *Heller*, 554 U.S. at 592).

[48] *Id.* at 883 (quoting 1 William Blackstone, Commentaries *354).

[49] *Id.* (quoting Blackstone at *359).

[50] *Id.* (quoting Patrick J. Charles, *Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU J. Pub. L. 35, 78 (2011)).

[51] *Id.* (citing Blackstone at *360).

[52] *Id.* (quoting *Jimenez-Shilon*, 34 F.4th at 1046).

[53] *Id.* at 883–84 (citing Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 217 n.54 (1983)).

[54] *Id.* at 883 (quoting Blackstone at *362) (citing James E. Pfander & Theresa R. Wardon, *Reclaiming the Immigration Constitution of the Early Republic: Prospectivity, Uniformity, and Transparency*, 96 Va. L. Rev. 359, 378–79 (2010)).

Next, the *Carbajal-Flores* court discussed the American colonial and Founding eras, during which "the English tradition continued."[55] Thus, "it was well understood that the right to bear arms 'did not extend to all New World residents.'"[56] Unfortunately, restrictions on slaves and Native Americans possessing firearms were commonplace, beginning with the colonies and continuing after the Revolutionary War.[57] As the Seventh Circuit noted, although these discriminatory restrictions "would unquestionably fail to overcome constitutional scrutiny today[,] … they nonetheless illuminate a historical throughline of disarming people based on their allegiances—or lack thereof."[58] These types of restrictions were not solely based on race—colonies also disarmed white men if they refused to swear an oath to the English sovereign.[59] Thus, throughout this period as well, there was a clear theme of restricting gun ownership to those who had expressed their loyalty to the sovereign.

Finally, the *Carbajal-Flores* panel considered post-ratification perceptions of the scope of the right to bear arms.[60] According to St. George Tucker (law professor and author of early American edition of Blackstone's Commentaries), aliens born outside of the United States were "generally subject to all the incapacities to which aliens [were]

---

[55] *Id.* at 884.

[56] *Id.* (quoting *Jimenez-Shilon*, 34 F.4th at 1047) (quoting, in turn, Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)).

[57] *Id.* at 884–86 (citing *Jiminez-Shilon*, 34 F. 4th at 1047; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 250 (2020); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting)).

[58] *Id.* at 885 (citing *Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting)).

[59] *Id.* (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 158 (2007); Adam Winkler, *Gun Fight: the Battle Over the Right To Bear Arms in America* 116 (2011)).

[60] The court cautioned against "giving postenactment history more weight than it can rightly bear." *Id.* at 887 (quoting *Bruen*, 597 U.S. at 35).

subject by the rules of the common law," which included prohibitions on gun ownership.[61] However, the alien could secure the rights of a citizen by making "the requisite declarations of his intention to become a citizen, and to renounce for ever all allegiance and fidelity to any foreign prince[ ] or state."[62]

In light of its examination of the Unites States' regulatory tradition, the *Carbajal-Flores* court concluded that disarming illegal aliens did not violate the Second Amendment because the restriction applies to "people who have not naturalized and taken the oath of renunciation and allegiance."[63]

*United States v. Aleman-Lozano*, a decision by the Middle District of Pennsylvania, appears to be the only post-*Bruen* case addressing a Second Amendment challenge to § 922(g)(5)(B).[64] The court in that case declined to decide whether such immigrants are part of "the people" under the Second Amendment.[65] Instead, the court proceeded to the second step of the analysis and concluded that "prohibiting the possession of firearms for this group of people is consistent with the history and tradition of this nation," namely the practice of "disarming those who have not sworn allegiance to the United States."[66]

The Court finds that § 922(g)(5)(B) does not, on its face or as applied to Defendant, violate the Second Amendment because the Government has shown that it is "consistent with this Nation's historical tradition of firearm regulation."[67] There is a consensus among

---

[61] *Id.* (quoting 2 William Blackstone & St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* app. 102 (1803)).

[62] *Id.* (quoting Blackstone & Tucker at app. 100).

[63] *Id.* at 889.

[64] *United States v. Aleman-Lozano*, No. 1:21-CR-00323, 2024 WL 1661111 (M.D. Pa. Apr. 17, 2024).

[65] *Id.* at *7. Although it declined to decide whether the Amendment covers such people, the court did conclude that authorized immigrants are "outside of the political community." *Id.*

[66] *Id.*

[67] *Bruen*, 597 U.S. at 17.

the courts that this country has a strong tradition of disarming those who have not expressed allegiance to the United States. This is because "[a]llegiance serves as a mark of trustworthiness" and "willingness to accede to the terms of social order."[68]

§ 922(g)(5)(B) applies to aliens admitted under a nonimmigrant visa. F-1 visas are held by those "having a residence in a foreign country which he has no intention of abandoning," who enter the United States "temporarily and solely for the purpose of" education.[69] Thus, on its face, the provision restricts aliens who have no intention of becoming a citizen and who have not declared allegiance to the United States. The Court finds that this restriction is supported by this country's history and tradition of firearm regulation. Defendant characterizes himself as "a young man lawfully present in the United States with no criminal history prior to possessing the firearm,"[70] but this does not change his nonimmigrant alien status. Therefore, the Court denies Defendant's Second Amendment challenge, both facial and as applied.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Indictment[71] is DENIED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 21st day of ____October____, 2025.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[68] *Carbajal-Flores*, 143 F.4th at 888.
[69] 8 U.S.C. § 1101(a)(15)(F)(i).
[70] Rec. Doc. 33-1, p. 4.
[71] Rec. Doc. 33.